IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Chelsea E. MANNING,<br>Plaintiff, | )<br>)<br>) | Case No.  1:16-CV-02307-CRC |
|  | ) |  |
| v. | )<br>) |  |
| James R. CLAPPER, *et al.*,<br>Defendants. | )<br>)<br>)<br>)<br>) |  |

## MOTION FOR PRELIMINARY INJUNCTION
(Fed. R. Civ. P. 65(a))

### Relief Sought

Plaintiff moves this Court for a preliminary injunction pending the final judgment in this action. The preliminary injunction will enjoin the Defendants, and their agents, servants, employees, and attorneys, and all persons in active concert and participation with this defendant, from--

(1)     conducting electronic surveillance involving the Plaintiff under Title I of the Foreign Intelligence Surveillance Act ("FISA");

(2)     conducting physical searches involving the Plaintiff under Title III of FISA;

(3)     seeking any further, future orders under Titles I and III of FISA involving the Plaintiff without any reasonable and justifiable cause.

### Grounds for Relief

It is essential that the court issue the requested preliminary injunction to prevent immediate and irreparable injury because:

1.     As established by the verified complaint, unless restrained by this court, the Defendants will perform the acts sought to be enjoined.

RECEIVED
Mail Room

JAN - 9 2017

Clerk of Court
District of Columbia

2.     As established by the verified complaint and the declaration of the Plaintiff, if the Defendant does perform the acts sought to be enjoined, the Plaintiff will suffer immediate and irreparable harm in that the Defendants' clandestine searches and seizures and electronic surveillance of her have violated, and will continue to violate--

(a)     the Plaintiff's right to freedom of speech, freedom of association, and ability to seek a redress of grievances guaranteed by the First Amendment of the United States Constitution;

(b)     the Plaintiff's right to be free from unreasonable searches and seizures under the Fourth Amendment of the United States Constitution;

(c)     the Plaintiff's right to due process of law guaranteed by the Fifth Amendment of the United States Constitution.

(d)     the Plaintiff's right to be free from cruel and unusual punishments prohibited by the Eighth Amendment of the United States Constitution.

3.     As established by the declaration of the Plaintiff and the Memorandum of Law in support of this Motion, the Plaintiff has no adequate remedy at law for the injuries sought to be prevented by the requested preliminary injunction.

4.     As shown by the verified complaint, the declaration of the Plaintiff, and the Memorandum of Law, the Plaintiff is likely to succeed on the merits of this action.

5.     As shown by the verified complaint, the declaration of the Plaintiff, and the Memorandum of Law, the requested preliminary injunction is in the public interest.

6.     As shown by the verified complaint, the declaration of the Plaintiff, and the Memorandum of Law, the issuance of a preliminary injunction will not cause undue inconvenience or loss to Defendant or any other interested parties.

**Support for Motion**

This motion is based on all of the papers and records on file in this action, including this document, the verified complaint, the supporting declaration of the Plaintiff, the supporting Memorandum of Law, and on whatever argument and evidence is presented at the hearing of this motion.

Respectfully submitted,

CHELSEA E. MANNING
Plaintiff, *pro se*
1300 North Warehouse Road
Fort Leavenworth, KS 66027-2304

January 3, 2016

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| Chelsea E. MANNING,<br>Plaintiff, | ) )<br>) | Case No.  1:16-CV-02307-CRC |
|  | )<br>) |  |
| v. | )<br>) |  |
|  | ) |  |
| James R. CLAPPER, *et al.*<br>Defendants. | )<br>)<br>) |  |
| _____ | ) |  |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S
## MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

LEGAL AND FACTUAL BACKGROUND ...................................................... 2

I.      The Foreign Intelligence Surveillance Act ............................................ 2

II.     The Physical Searches and Electronic Surveillance involving the Plaintiff ...... 4

ARGUMENT ...................................................................................................... 7

I.      Plaintiff is Likely to Succeed on the Merits ......................................... 8

        A.      The Defendants' Physical Searches and Electronic Surveillance involving the
                Plaintiff are Unreasonable................................................................ 8

        B.      The Electronic Surveillance and Physical Searches by Defendants infringe upon
                the First Amendment ..................................................................... 12

        C.      The Procedures of FISA infringe upon the First Amendment ................ 15

        D.      The Orders under FISA fail to provide Due Process............................. 17

        E.      The Defendants' Actions during the "False Flag Operation" constitute
                Cruel and Unusual Punishment ....................................................... 22

II.     Plaintiff is Likely to Suffer further Irreparable Injury if Relief is Not Granted............. 24

III.    The Balance of Equities weigh in favor of the Plaintiff........................... 25

IV.     A Preliminary Injunction is in the Public Interest................................. 26

CONCLUSION ................................................................................................. 26

# TABLE OF AUTHORITIES

## Cases

*Aamer v. Obama*, 742 F.3d 1023 (D.C. Cir. 2014) ..................................................... 7

*Abdullah v. Obama*, 753 F.3d 193 (D.C. Cir. 2014) .................................................... 7

*American Civil Liberties Union v. Clapper*, 785 F.3d 787 (D.C. Cir. 2014) .................. 11, 13, 26

*American Ins. Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511 (1828) .......................................... 20

*Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't. of Agric.*, 573 F. 3d 815 (D.C. Cir. 2009) ............... 25

*Baltimore & Ohio Railroad Co. v. United States*, 298 U.S. 349 (1936) ........................................ 21

*Bates v. City of Little Rock*, 361 U.S. 516 (1960) ........................................................................ 14

*Bender v. Williamsport Area School Dist.*, 475 U.S. 534 (1986) ................................................... 18

*BE&K Constr. Co. v. NLRB*, 536 U.S. 616 (1986) ........................................................................ 15

*Berger v. New York*, 388 U.S. 41 (1967) ....................................................................................... 11

*Bill Johnson's Restaurants, Inc. v. NLRB* (1986) .................................................................... 15-16

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011) ............................................................ 15-16

*Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951) ................................................... 10

*Brigam City v. Stuart*, 547 U.S. 398 (2006) ................................................................................. 10

*Buckley v. Valeo*, 424 U.S. 1 (1976) ............................................................................................. 14

*California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) .............................. 16

*County of Sacramento v. Lewis*, 523 U.S. 833 (1998) ............................................................ 23, 24

*Cheney v. U.S. Dist. Court*, 542 U.S. 367 (2004) ......................................................................... 10

*Clark v. Library of Congress*, 750 F.2d 89 (D.C. Cir. 1984) .................................................. 12, 13

*Clinton v. City of New York*, 524 U.S. 417 (1998) ........................................................................ 18

*Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288 (D.C. Cir. 2009) ......................................... 7

*Dynes v. Hoover*, 61 U.S. (20 How.) 65 (1857) ............................................................................ 20

*Dent v. West Virginia*, 129 U.S. 114 (1889) ................................................................................. 21

*Elrod v. Burns*, 427 U.S. 347 (1976) ............................................................................................ 14

*Ex parte v. Quirin*, 317 U.S. 1 (1942) .......................................................................................... 20

*Farmer v. Brennan*, 511 U.S. 825 (1994) ..................................................................................... 22

*Gibson v. Fla. Legislative Comm.*, 372 U.S. 539 (1963) ................................................. 15

*Hudson v. McMillian*, 503 U.S. 1 (1991) ....................................................................... 23

*In re Grand Jury Investigation of Possible Violation of 18 U.S.C. § 1461* et seq.,
706 F. Supp. 2d 11 (D.C.D.C. 2009) .................................................................. 12, 13

*Kyllo v. United States*, 533 U.S. 27 (2001) ............................................................ 12-13
*Loughlin v. United States*, 393 F.3d 155 (D.C. Cir. 2004)............................................ 18

*Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379 (1884)......................................... 18

*Mathews v. Eldridge*, 424 U.S. 319 (1976) ................................................................. 21

*Mazurek v. Armstrong*, 520 U.S. 968 (1997).................................................................. 7

*Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272 (1855)............. 20

*Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521 (10th Cir. 1994)................................. 12

*Nixon v. United States*, 418 U.S. 683 (1974)................................................................. 10

*O.K. v. Bush*, 377 F. Supp. 2d 102 (D.C.D.C. 2005)                    ........................ 23

*Palmore v. United States*, 411 U.S. 389 (1973) ........................................................... 20

*Postmaster-General v. Early*, 25 U.S. (12 Wheat.) 136 (1827)....................................... 19

*Reporters Committee for Freedom of Press v. American Tel. & Tel. Co.*, 593 F.2d 1030
(D.C.Cir. 1977)................................................................................................... 14

*Resolution Trust Corp. v. Dabney*, 73 F.3d 262 (10th Cir. 1995) .............................. 9-10

*Samson v. California*, 547 U.S. 843 (2006) .................................................................. 11

*Scott v. Conley*, 937 F. Supp. 2d 60 (D.C.D.C. 2013) .................................................. 21

*Sherley v. Sebelius*, 644 F.3d 388 (D.C. Cir. 2010)........................................................ 7

*Stanford v. Texas*, 379 U.S. 476 (1965) ...................................................................... 14

*Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984) ........................................................ 15, 16

*Thomas v. Collins*, 326 U.S. 516 (1945) ....................................................................... 16

*Tuck v. Pan American Health Organization*, 668 F.2d 547 (D.C. Cir. 1981) ................................ 18

*United States v. Bobo*, 477 F.2d 974 (4th Cir. 1973) ........................................................ 11

*United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980) ........................................... 10

*United States v. Haldeman*, 559 F.2d 31 (D.C. Cir. 1976) ............................................ 10

*United States v. Heldt*, 668 F.2d 1238 (1981) ............................................................... 14

*United States v. Hoffman*, 995 F. Supp. 2d 555 (E.D.Va. 2014) ................................. 22
*United States v. Hoffman*, 612 Fed. Appx. 162 (4th Cir. 2015) ................................... 22

*United States v. Powell*, 379 U.S. 48 (1964) ................................................................. 8

*United States v. Rayburn House Office Building*, 497 F.3d 654 (D.C. Cir. 2007)....................... 14

*United States v. Squillacote*, 221 F.3d 542 (4th Cir. 2000)..........................................22, 24

*United States v. United States District Court for Eastern District of Michigan*,
407 U.S. 297 ("*Keith*") (1972) ........................................................................... 3, 12

*United States v. Westinghouse Elec. Corp.*, 788 F.2d 164 (3d Cir. 1986) ..................... 10

*Virginia v. Moore*, 533 U.S. 164 (2008) ........................................................................ 11

*ViroPharma Inc. v. Hamburg*, 471 Fed. Appx. 1 (D.C. Cir. 2012) ............................... 18

*Wayte v. United States*, 470 U.S. 598 (1985) ................................................................ 16

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ................................................................. 18

*United States v. Rayburn House Office Building*, 497 F.3d 654 (D.C. Cir. 2007)....................... 23

*Wilson v. Seiter*, 501 U.S. 294 (1991) ........................................................................... 23

*Wolff v. McDonnell*, 418 U.S. 539 (1974) ................................................................. 20-21

*Yassin Muhiddin Aref v. Holder*, 774 F. Supp. 2d 147 (D.C.D.C. 2011) ..................... 22

*Zurcher v. Stanford Daily*, 436 U.S. 547 (1978) .......................................................... 14

**Statutes**

10 U.S.C. § 801 *et seq.* (Uniform Code of Military Justice) ........................................... 5

18 U.S.C. § 2 *et seq.* ........................................................................................................ 5

18 U.S.C. Appx. IV § 1 *et seq.* (Classified Information Procedures Act) ..................................... 1

50 U.S.C. §§ 1801 *et seq.* (Title I of FISA) ................................................. 1-2, 6, 8, 2, 16

50 U.S.C. § 1801 ................................................................................................... 4

50 U.S.C. § 1803 ................................................................................. 3, 16, 17, 19

50 U.S.C. § 1805 ................................................................................................. 8, 25

50 U.S.C. § 1821 *et seq.* (Title III of FISA) ................................................. 1-2, 8, 12, 16

50 U.S.C. § 1822 .......................................................................................... 17, 19

50 U.S.C. § 1824 .......................................................................................... 8, 25

Pub. L. 95-511 (Oct. 25, 1978) (Foreign Intelligence Surveillance Act of 1978) ........................ 4

## Other Authorities

S. Rep. No. 95-604 (1977) (Church Committee Report) ................................................ 4

*Military Correctional Complex, Standard Operating Procedure 26, Inmate Personal Property Disposition* (Sep. 21, 2010) ........................................................................... 5

*Military Correctional Complex, Standard Operating Procedure 26, Search and Inspection Procedures* (Sep. 29, 2014) ............................................................................ 5

Neil M. Richards, *The Dangers of* Surveillance, 126 Harv. L. Rev. 1934 (2013) ......................... 9

*Kramerbooks*, 26 Med. L. Rptr. 1601 ................................................................. 13

*Black's Law Dictionary* (9th Ed. 2009) .......................................................... 19, 20

*Merriam Webster's Collegiate Dictionary* (11th Ed. 2012) ....................................... 19, 20

## INTRODUCTION

At some point prior to October 3, 2016, a Federal officer from the National Security Division ("NSD") under Plaintiff Department of Justice ("DOJ") filed applications for electronic surveillance and physical searches involving the Plaintiff before the Foreign Intelligence Surveillance Court ("FISC"). These applications were subsequently approved by the FISC under the provisions of Titles I and III of the Foreign Intelligence Surveillance Act of 1978, as amended ("FISA"). 50 U.S.C. §§ 1801 *et seq.*; 1821 *et seq.*

The Plaintiff is a United States citizen incarcerated at the United States Disciplinary Barracks ("USDB") in Fort Leavenworth, Kansas. Prior to her incarceration, the Plaintiff had a security clearance and access to classified information in relation to her duties as an intelligence analyst for Defendant Department of Defense ("DOD"). Currently, she maintains a limited security clearance under the Classified Information Procedures Act of 1980, as amended ("CIPA"). 18 U.S.C. Appx. IV § 1 *et seq.*

The Plaintiff is a public figure. She writes regularly for many print and online publications, including the *Guardian*, and *Medium.com*. She also frequently responds to interview questions through an assistant or her legal counsel.

The Plaintiff, even while in prison has had her life significantly disrupted by the Defendants' activities in this case. The Defendants' have provoked intense fear, discomfort, and anxiety by conducting electronic surveillance of her associates, clandestine physical searches around her and her associates, and intrusions of personal computers and handheld devices via computer network exploitation ("CNE") techniques. This also includes the physical illness and terror caused by the Defendants during an unorthodox operation in which the Plaintiff was

1

enticed to engage in unlawful activities by Federal agents posing as nefarious actors in a simulated terrorist attack and hostage situation.

The Plaintiff filed suit on November 7, 2016 contending that the Director of National Intelligence ("DNI"), the DOJ, Federal Bureau of Investigation ("FBI"), the DOD, and the National Security Agency ("NSA") engaged in electronic surveillance and physical searches that directly involved the Plaintiff, under the auspices of Titles I and III of FISA. The Plaintiff also contends that the Defendants have violated her First, Fourth, Fifth and Eighth Amendment rights by their activities associated with executing the surveillance and searches.

The Plaintiff seeks, among declaratory relief for the Constitutional violations, an injunction that permanently enjoins the Defendants from engaging in unreasonable electronic surveillance and physical searches in the future.

The Plaintiff now moves this Court for a preliminary injunction that, pending the completion of this suit, that bars the Defendants from—

    (a)    conducting electronic surveillance under Title I;

    (b)    conducting physical searches under Title III of FISA; and

    (c)    seeking any future orders under Titles I and III of FISA without any reasonable and justifiable cause.

The Plaintiff has already suffered irreparable injury at the hands of the Defendants. The Plaintiff will suffer further irreparable injury in the absence of a preliminary injunction. The Plaintiff is substantially likely to succeed on the merits of her claims.

The electronic surveillance and physical searches violate numerous provisions of the United States Constitution, including freedom of speech, freedom of association, the right to petition the United States government for redress of grievances, the right against unreasonable

searches and seizures, the right to due process of law, and the right to be free from cruel and unusual punishment.

Preliminary relief for the Plaintiff is appropriate and necessary.

## LEGAL AND FACTUAL BACKGROUND

### I.    THE FOREIGN INTELLIGENCE SURVEILLANCE ACT

Congress enacted FISA in order to regulate the foreign intelligence surveillance activities conducted by the United States government.

FISA was adopted by Congress following the Supreme Court's holding that the Fourth Amendment does not permit any warrantless surveillance in intelligence investigations of domestic security threats. *United States v. United States District Court for Eastern District of Michigan*, 407 U.S. 297, 313-314, 92 S. Ct. 2125, 32 L. Ed. 2d 752 ("*Keith*") (1972) (citations omitted).

Congress's statutory response to *Keith* followed several years of inquiry and investigation by both houses of Congress that revealed widespread misuse of surveillance without any warrants. This primarily included political activities that are protected by the First Amendment, as well as anyone who is "engaged in no criminal activities and who posed no genuine threat to the national security." S. Rep. No. 96-604, pt. 1, at p. 8 (1977), *reprinted in* 1978 U.S.C.C.A.N. 3904, 3909 (quotation marks omitted).

With the enactment of FISA came the creation of the FISC. 50 U.S.C. § 1803 (a). Congress empowered the FISC to grant and deny government applications for orders in foreign intelligence investigations. The FISC generally operates in near total secrecy. It hears only from the United States government counsel, *ex parte*. Also, until very recently, the FISC rarely published any of its decisions or opinions.

The two provisions at issue in this case, namely Titles I and III, were in the original FISA. Pub. L. 95-511, Titles I and III, §§ 101 *et seq.*; 301 *et seq.* (Oct. 25, 1978).  Title I covers domestic electronic surveillance by passive means, including acquisitions, intentional acquisitions, and the installation and operation of surveillance devices.  50 U.S.C. § 1801 (f). Title III, meanwhile, covers any physical searches, including electronic intrusions, "within the United States into premises or property [ . . . ] that is intended to result in a seizure, reproduction, inspection, or alteration of information, material, or property[.]"

## II.   THE PHYSICAL SEARCHES AND ELECTRONIC SURVEILLANCE INVOLVING THE PLAINTIFF

Beginning as early as October 3, 2016, the Defendants conducted multiple clandestine physical searches at the USDB.  These searches directly and indirectly involved the Plaintiff and were conducted in close physical proximity to the Plaintiff, her living areas, and working areas.

With hundreds of people living and working in the USDB at any given moment, the Defendants believed they would need to create an incident with plausible deniability.  As a result, the Defendants came up with a cover story to conduct these searches.  In this case the Defendants' cover story was that a tool went missing from a prison work detail.  This is a rare and very serious event that would normally merit the prison to conduct frequent and intensive physical searches on all personnel, inmates, and property.  However, the actual purpose of these sweeping searches was allegedly related to intelligence gathering in the interest of national security.

Multiple Federal agents conducted clandestine physical searches of targeted locations. This included the Plaintiff's general population living area and cell.  Meanwhile, prison staff, likely unaware of the true purpose of the searches, searched the cells of other inmates and

interviewed them. Additional scrutiny and searches were also made against certain staff entering and leaving the USDB.

During the search of the Plaintiff's cell, the Defendants obtained and seized three plastic spoons, a used comb, and a conventional non-scientific calculator. These items likely fell under categories of items requested in the Title III application—namely, DNA and electronic storage items.

The Plaintiff was not notified of any items being taken. This is despite there being a protocol requiring prisoners to be notified of items seized. *See generally Military Correctional Complex, Standard Operating Procedure 31, Search and Inspection Procedures* ("MCC SOP 31") (September 29, 2014); *also Military Correctional Complex, Standard Operating Procedure 26, Inmate Personal Property Disposition* ("MCC SOP 26") (September 21, 2010).

Later, an attempted physical search occurred in the Special Housing Unit ("SHU"), a special high security wing of the USDB. This search directly involved the Plaintiff and was conducted by undercover Federal agents, including agents from the Counterespionage Unit ("CES") of the FBI's Washington Field Office ("WFO"), while being supervised by lawyers from DOJ's NSD.

This attempted physical search occurred at or between 6:00 P.M. through 8:00 A.M. on October 10 through 11, 2016. The search required an intricate and elaborate ruse to be conducted by the undercover agents. They simulated a terrorist attack on the SHU wing of the USDB, and—while claiming to be there to set the Plaintiff free—unsuccessfully enticed the Plaintiff to engage in a Federal prosecutor's dream indictment of illicit activities that are criminal offenses under the Uniform Code of Military Justice ("UCMJ"), 10 U.S.C. §§ 801 *et seq.* and Title 18, United States Code, *see generally* 10 U.S.C. §§ 2 *et seq.*

No information was derived or obtained from the Plaintiff or the proximate physical area around her by the Defendants during this attempted search, as the Plaintiff refused to cooperate with the undercover agents. This prevented the undercover agents from searching the cell, the Plaintiff, or obtaining and altering any physical items or information.

The Plaintiff suffered severe terror and anxiety during this attempted physical search. Additionally, the Plaintiff became physically ill from the prolonged high anxiety, vomiting on at least two separate occasions.

A third distinct physical search occurred during a telephonic conversation between the Plaintiff and an associate. This telephone call occurred at approximately 9:45 P.M. to 10:00 P.M. on November 3, 2016. During the phone call, the Plaintiff's associate suffered from an electronic intrusion into her personal handheld device ("smart phone") using computer network exploitation ("CNE") methods. This electronic intrusion was conducted by the National Security Agency ("NSA") and DOD on behalf of other the Defendants.

The phone call was interrupted and terminated in unusual circumstances, causing the Plaintiff and her associate to panic.

Since at least October 3, 2016, throughout the entirety of October 2016, and possibly extending prior to October to today, the Defendants have conducted sweeping electronic surveillance of the Plaintiff and at least several dozen to possibly several hundred individuals directly and indirectly associated with the Plaintiff.

This electronic surveillance has utilized all four passive methods under Title I of FISA to gather audio, visual, and electronic information from wire and wireless telephone networks, the Internet, and the physical locations proximate to the Plaintiff.

## ARGUMENT

The Plaintiff has requested for a preliminary injunction against the Defendants. The courts have found that a "preliminary injunction is an 'extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Abdullah v. Obama*, 753 F.3d 193, 197-198, 410 U.S. App. D.C. 80, 85 (quoting *Sherley v. Sebelius*, 644 F.3d 388, 392, 396 U.S. App. D.C. 1 (D.C. Cir. 2011)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).

The Plaintiff, as the movant, "by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972, 117 S. Ct. 1865, 138 L. Ed. 2d 162 (1997) (quotation marks omitted)); *see also Abdullah*, 753 F.3d at 197.

In order to justify the motion for preliminary injunction, the Plaintiff must show that—

(a)     she is likely to succeed on the merits;

(b)     she is likely to suffer "irreparable injury" if the preliminary relief is not granted;

(c)     the balance of equities tip in her favor; and

(d)     that an injunction is in the public interest.

*Aamer v. Obama*, 742 F.3d 1023, 1038 408 U.S. App. D.C. 291 (D.C. Cir. 2014) (quoting *Sherley*, 644 F.3d; *see also Winter*, 555 U.S. at 20; *Davis v. Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1292, 387 U.S. App. D.C. 205 (D.C. Cir. 2009) (Plaintiff "has burden to show that all four factors, taken together, weigh in favor of the [preliminary] injunction."

For the following reasons, preliminary relief is warranted in this matter.

I.      **PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS.**

      A.      **THE DEFENDANTS' PHYSICAL SEARCHES
             AND ELECTRONIC SURVEILLANCE INVOLVING
             THE PLAINTIFF ARE UNREASONABLE.**

The primary issue with the Defendants' clandestine searches and surveillance is that they cannot feasibly be considered "relevant" under Titles I and III of FISA. In fact, the Defendants fail to articulate any reason, whatsoever, to conduct a foreign intelligence investigation in this case. Therefore, the Defendants' searches and surveillance violate the Fourth Amendment of the United States Constitution.

A Fourth Amendment search occurs "when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v. United States*, 533 U.S. 27, 33, 121 S. Ct. 2038, 150 L. Ed. 2d 94, (2001). Under the *Kyllo* these clandestine searches, seizures, and surveillance constitute Fourth Amendment searches.

Even by statute, Titles I and III of FISA simply do not authorize the government to arbitrarily conduct intrusive and sophisticated clandestine physical searches and electronic surveillance without any reasonable showing of probable cause. 50 U.S.C. §§ 1805 (b), 1824 (b).

The collection of audio, video, electronic information, and physical items reveal intimate details about the Plaintiff and her associates that any reasonable person would consider private— even within the Plaintiff's current circumstances. This is because of the unique clandestine nature of the searches and surveillance.

Even with the Plaintiff confined in a prison, her associates simply do not expect that the Defendants would record *all* of their telephonic conversations, their e-mails, their text messages,

and to analyze *all* of their relationships and associations with anyone else. They also do not expect the government to use intrusive methods to penetrate their personal electronic devices.

Meanwhile, the phone calls from the prison by inmates provide an audio notice that such calls are monitored and recorded—however, such a notice simply does not extend to anyone and everyone associated with her and subsequently associated with them as well under virtually every electronic communications method regularly used today.

Again, even with the Plaintiff confined in a prison, she does not expect an undercover agent disguised as a prison guard or a prison beat military investigator to quietly sneak into her cell and search her belongings, and take any items without any notification being given to her.

The Plaintiff also does not expect undercover agents to execute an elaborate psychological operation with the intent of conducting a search of her person, and disappear into the night when the operation fails. While, prison staff can easily conduct cell searches and pat-downs of inmates, they cannot execute such acts with the secrecy and precision of an undercover operation.

Put simply, surveillance and searches of this kind are extraordinary. Such searches and surveillance constitute practices normally reserved for authoritarian regimes. *See, e.g.,* Neil M. Richards, *The Dangers of Surveillance,* 126 Harv. L. Rev. 1934, 1934 (2013) (Until recently, "the threat of constant surveillance has been relegated to the realms of science fiction and failed totalitarian states).

Courts have found that the purpose of narrowing the scope of searches and seizures is to prevent abuse of the judicial process by the government, to protect individuals from unwarranted harassment, and to serve society's interest in limiting the cost of unnecessary litigation. *See, e.g., United States v. Powell,* 379 U.S. 48, 57-58 (1964); *Resolution Trust Crop v. Dabney,* 73

F.3d 262 (10th Cir. 1995); *United States v. Westinghouse Elec. Corp.*, 788 F.2d 164, 166-167 (3rd Cir. 1986).

Historically, the courts have regularly quashed government requests and subpoenas that lacked any direct relationship to an underlying investigation, or failed to distinguish bright lines or a narrow scope. *See, e.g.*, *Bowman Dairy Co. v. United States*, 341 U.S. 214, 221 (1951) (invalidating a subpoena's "catch-all provision" on the grounds that it was "merely a fishing expedition"). Courts also reject government requests when they fail to identify outer limits for categories of information and evidence they seek, or cover enormous ranges of irrelevant information. *See Nixon v. United States*, 418 U.S. 683, 698-99, 94 S. Ct. 3090, 41 L. Ed. 2d 1039 (1974) (citing *Bowman*, 314 U.S. at 220); *also United States v. Haldeman*, 559 F.2d 31, 75, 181 U.S. App. D.C. 254 F.2d 31, 75 (D.C. Cir. 1976) (subpoenas are "not a discovery device," and should be quashed when "unreasonable or oppressive") (citations and quotations omitted); *In re Horowitz*, 482 F.2d 72, 79 (2d Cir. 1973) (Friendly, J.) (narrowing a grand-jury subpoena on ground it improperly demanded contents of multiple filing cabinets "without any attempt to define classes of potentially relevant documents or any limitations as to the subject matter or time period"); *United States v. Cuthbertson*, 630 F.2d 139, 146 (3d Cir. 1980) (subpoena "even as modified by the district court, constituted a broad request for material [ . . . ] on a very slight showing of the evidentiary nature of the material sought"); *cf. Cheney v. U.S. Dist. Court*, 542 U.S. 367, 387-88 (2004) (approving of circuit court's reversal of "overbroad" discovery orders that were "anything but appropriate" because they "ask[ed] for everything under the sky");

The "ultimate touchstone of the Fourth Amendment" is "reasonableness." *Brigam City v. Stuart*, 547 U.S. 398, 403 (2006). Reasonableness is determined by examining the "totality of circumstances" to "assess[], on the one hand, the degree to which [the government's conduct]

intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Samson v. California*, 547 U.S. 843, 848 (2006) (quotation marks omitted); *see also Virginia v. Moore*, 533 U.S. 164, 169 (2008).

In the context of electronic surveillance, reasonableness demands that the statutes have "precise and discriminate" requirements and that the surveillance authority be "carefully circumscribed so as to prevent unauthorized invasions of privacy." *Berger v. New York*, 388 U.S. 41, 58, 18 L. Ed. 2d 1040, 87 S. Ct. 1873, (1967) (quotation marks omitted); *see also United States v. Bobo*, 477 F.2d 974, 980 (4th Cir. 1973) ("[W]e must look [ . . . ] to the totality of the circumstances and the overall impact of the statute if it authorizes indiscriminate and irresponsible use of electronic surveillance if it authorizes a reasonable search under the Fourth Amendment.").

In the case, the intrusion upon the Plaintiff and her associates is substantial and widespread. The Defendants have acquired, and shall continue to acquire large volumes of information about the Plaintiff, her associates, and subsequently, their own associates. Such information creates detailed picture about the Plaintiff and the map of her entire network. This picture reveals information so intimate and detailed that neither the Plaintiff nor her aggrieved associates could possibly determine and discover such information by themselves. *See generally American Civil Liberties Union v. Clapper*, 785 F. 3d 77 (2nd Cir. 2015).

For the foregoing reasons, the Defendants' clandestine searches, seizures and surveillance of the Plaintiff violate the Fourth Amendment of the United States Constitution.

**B.    THE ELECTRONIC SURVEILLANCE AND
PHYSICAL SEARCHES BY THE DEFENDANTS
INFRINGE UPON THE FIRST AMENDMENT**

The clandestine investigative tools utilized by the Defendants for electronic surveillance

and physical searches under Titles I and III of FISA have a uniquely acute potential to stifle the

rights of freedom of speech, freedom of expression, and freedom of association, for the Plaintiff

and virtually every individual in association with the her.

Such intrusive government surveillance and searching by the Defendants can produce a

profound chilling effect on the rights guaranteed by the First Amendment of the U.S.

Constitution. The Supreme Court has explicitly describe such dangers, noting that—

> National security case [ . . . ] often reflect a convergence of First and Fourth
> Amendment values not present in cases of "ordinary" crime. Though the
> investigative duty of the executive may be stronger in such cases, so is there
> greater jeopardy to constitutionally protected speech. "Historically the struggle
> for freedom of speech and press in England was bound up with the issue of the
> scope of the search and seizure of power[.]" [ . . . ]
>
> The price of lawful public dissent must not be a dread of subjection to an
> unchecked surveillance power. Nor must the fear of unauthorized official
> eavesdropping deter vigorous citizen dissent and discussion of Government action
> in private conversation. For private dissent, no less than open public discourse, is
> essential to our free society.

*Keith* 407 U.S. at 313-314 (citations omitted)

In light of this reality, several courts of appeal have adopted a two-part "exacting

scrutiny" test to determine whether a government action substantially burdens the rights

guaranteed by the First Amendment. *In re Grand Jury Investigation of Possible Violation of 18*

*U.S.C. § 1461* et seq., 706 F. Supp. 2d 11, 18 (D.C.D.C. 2009) (First Amendment and grand jury

subpoena); *Clark v. Library of Congress*, 750 F.2d 89, 94 (D.C. Cir. 1984) (First Amendment

and government field investigation); *Nat'l Commodity & Barter Ass'n v. Archer*, 31 F.3d 1521,

1531 n.4 (10th Cir. 1994) (wholesale seizure of membership information); *see also In re Grand*

*Jury Proceedings*, 776 F.2d 1099, 1102-1103 (2d Cir. 1985). In order to survive any challenge under the First Amendment "the government must show that they have a compelling interest in obtaining the sought-after material and that there is a sufficient nexus between the subject matter of the investigation and the information they seek." *In re Grand Jury*, 706 F. Supp. 2d at 18 (citing *Kramerbooks*, 26 Med. L. Rptr. At 1601).

While conducting this investigation the Defendants have utilized and are continuing to utilize incredibly sophisticated and elaborate means under Titles I and III of FISA when the tools readily available to them are abundant in the Plaintiff's case—namely, recorded prison phones, frisk and pat-down searches, strip searches, usage of confidential informants, and hundreds of closed circuit television cameras.

Under the "exacting scrutiny" standard, the Defendants will be unable to reasonably or rationally articulate that the surveillance and physical searches utilized the "available means" that are "least restrictive" of any rights protected by the First Amendment. *Clark*, 750 F.2d at 95.

As noted above, the ongoing intrusions involving the Plaintiff and her associates have been substantial. *See supra*, at 11. The Defendants have acquired voluminous information about the Plaintiff, her associates, and subsequently, their own associates. As noted above, such information will create a high resolution picture about the Plaintiff and the patterns of life of everyone in her entire network—information so intimate and detailed that neither the Plaintiff nor her aggrieved associates could possibly determine and discover such information by themselves. *See generally ACLU*, 785 F. 3d 77.

Such scrutiny of the Defendants' extraordinary means under FISA shall be "necessary even if any deterrent effect on the exercise of First Amendment rights arises, not through direct

government action, but indirectly as an unintended but inevitable result of the government's conduct[.]" *Elrod v. Burns*, 427, 347, 362 96 S. Ct. 2673, 49 L. Ed. 2d 547 (1976) (quoting *Buckley v. Valeo*, 424 U.S. 1, 65, 46 L. Ed. 2d 659, 96 S. Ct. 612 (1976) (per curiam)); *see also Bates v. City of Little Rock*, 361 U.S. 516, 523, 80 S. Ct. 412, 4 L. Ed. 2d 480 (1960) ("Freedoms such as these are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle government interferences" (citations omitted)).

While the Fourth Amendment is clearly infringed upon in this case, the Plaintiff's protections under the First Amendment are distinctly different from, and carry significantly more weight than even those afforded by the Fourth Amendment. *See Reporters Committee for Freedom of Press v. American Tel. & Tel. Co.*, 593 F.2d 1030 (D.C. Cir. 1977); *United States v. Heldt*, 668 F.2d 1238 (1981); *United States v. Rayburn House Office Building*, 497 F.3d 654.

When applying a Fourth Amendment analysis in cases such as the Plaintiff's, the courts provide First Amendment interests with a wholly separate category of weight, requiring a "scrupulous exactitude" when expressive information is at stake. *Zurcher v. Stanford Daily*, 436 U.S. 547, 564 (quoting *Stanford v Texas*, 379 U.S. 476, 485, 85 S. Ct. 506, 13 L. Ed. 2d 431 (1965)); *see Marcus v. Search Warrants*, 367 U.S. 717, 81 S. Ct. 1708, 1716, 6 L. Ed. 2d 1127 (1961).

Unlike in this case, in normal, run-of-the-mill criminal cases carefully crafted search warrants that are supported by probable cause may overcome any countervailing First Amendment interest. However, the Defendants' thirst for information by clandestine means has become an even broader demand than a standard search warrant. The Defendants' have cast an incredibly wide electronic surveillance dragnet around the Plaintiff and her associates, as well as conducting "sneak and peek" physical search powers in proximity of her living and working

areas.

In cases such as this, the Courts are keen to set aside or restrict any such vague demands, such as the ones proffered by the Defendants. *See Gibson v. Fla. Legislative Comm.*, 372 U.S. 539, 546 (1963) (finding that "[c]ompelling [the NAACP], engaged in the exercise of First [ . . . ] Amendment rights, to disclose its membership presents [ . . . ] a question wholly different from the Communist Party to disclose its own membership.").

For the foregoing reasons, the Defendants' clandestine searches, seizures, and surveillance involving the Plaintiff and her associates violate the protections of freedom of speech, freedom of expression, and freedom of association under the First Amendment of the United States Constitution.

### C.   THE PROCEDURES OF FISA INFRINGE UPON THE FIRST AMENDMENT.

The Defendants' applications under Titles I and III of FISA to the FISC are not subject to any scrutiny or redress by the Plaintiff as an aggrieved person. The *ex parte* and secretive nature of the FISC inherent under FISA bar, *prima facie*, the Plaintiff from petitioning the Defendants for any such redress, and as such violate the Petition Clause of the First Amendment.

The Supreme Court has confirmed that "the Petition Clause protects the right of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387; 131 S. Ct. 2488; 180 L. Ed. 2d 408 (2011) (Employee sues borough alleging retaliation in violation of First Amendment's Petition Clause). Additionally, "the right of access to the courts for redress of wrongs is an aspect of the First Amendment right to petition the government." *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883, 896-897, 104 S. Ct. 2803, 81 L. Ed. 2d 732 (1984); *see also BE&K Constr. Co. v. NLRB*, 536 U.S. 516, 525, 122 S. Ct. 2390, 153 L. Ed. 2d 499 (2002); *Bill Johnson's*

*Restaurants, Inc. v. NLRB*, 461 U.S. 731, 741 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983) (Holding employer's filing of state suit against employees for libelous statements and injury to business is not unfair labor practice unless unreasonable and filed for retaliatory purposes); *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 513, 92 S. Ct. 609, 30 L. Ed. 642 (1972) (holding that activities attempting to influence legislative, executive, administrative or judicial action to eliminate competition are wholly immune from antitrust liability unless conduct falls within the "sham exception" to doctrine).

The Supreme Court has also acknowledged that the right to speak and the right to petition are "cognate rights." *Guarnieri*, 564 U.S. at 388, (*quoting Thomas v. Collins*, 323 U.S. 516, 530, 65 S. Ct. 315, 89 L. Ed. 430 (1945)); *see also Wayte v. United States*, 470 U.S. 598, 610, n. 11, 105 S. Ct. 1524, 84 L. Ed. 2d 547 (1985). "It was not by accident or coincidence that the rights to freedom in speech and press were coupled in a single guaranty with the rights of the people peaceably to assemble and to petition for redress of grievances." *Thomas*, 323 U.S. at 530.

The purpose of petitioning is to allow "citizens to express their ideas, hopes, and concerns to their government," and "is generally concerned with expression directed to the government seeking redress of a grievance." *Guarnieri*, 564 U.S. at 387. "A petition conveys the special concerns of its author to the government and, in its usual form, requests action by the government to address those concerns." *Id*, at 388-89; *see also Sure Tan, Inc.*, 467 U.s. at 896-897.

Under Titles I and III of FISA, the jurisdiction of the FISC is limited "to hear[ing] applications for and grant[ing] orders" that approve "electronic surveillance anywhere within the United States," 50 U.S.C. § 1803 (a)(1), or for "a physical search in the United States of the premises, property, information, or material of a foreign power or an agent of a foreign power for

the purpose of collecting foreign intelligence information," 50 U.S.C § 1822 (c). Meanwhile, the FISCR only has the authority "to review the denial of any application made under" the provisions of Titles I and III of FISA.  50 U.S.C. § 1803 (b).

The Plaintiff in this case is certainly a member of the public.  Meanwhile the Defendants in this case are certainly governmental entities, namely Federal departments, agencies, and their respective heads.  In essence, under FISA, the Petitioner is simply left with no meaningful avenue to redress her grievances.  The violation of her privacy and her property by the Defendants are certainly matters of great personal and public value and import.  The Petitioner's grievances would, in the absence of the restrictive FISA provisions, normally be redressed through the courts.

For the foregoing reasons, the Defendants' clandestine searches, seizures and surveillance of the Plaintiff violate the protection of her right to petition the government for redress guaranteed under the First Amendment of the United States Constitution.

### D.      THE ORDERS UNDER FISA
### FAIL TO PROVIDE DUE PROCESS

As noted above, *see supra*, at p. 15, the Defendants' applications under Titles I and III of FISA were not subjected to any scrutiny or redress by the Plaintiff as an aggrieved person. Indeed the Plaintiff has received no official notice of the involvement of FISC or the clandestine surveillance and physical searches conducted by the Defendants.

Additionally, the FISC operates in an *ex parte* stovepipe.  The FISC only ever hears one side of the story—one side of the controversy.  In essence, there is no controversy raised before the FISC.  The FISC operates as no other Article III court in U.S. jurisprudence.  In fact, it is, *prima facie*, not an Article III court at all.  This violates the Plaintiff's right to due process of law under the Fifth Amendment of the United States Constitution.

There is little dispute that the Federal courts are of limited jurisdiction. *See Mansfield, C. & L. M. R. Co. v. Swan*, 111 U.S. 379, 383, 4 S. Ct. 510, 28 L. Ed. 462 (1884); *also Clinton v. City of New York*, 524 U.S. 417, 429, 118 S. Ct. 2091, 141 L. Ed. 2d 393 (1998) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155, 110 S. Ct. 1717, 109 L. Ed. 2d 135 (1990)); *ViroPharma Inc. v. Hamburg*, 471 Fed. Appx. 1, 2 (D.C. Cir. 2012); *Loughlin v. United States*, 393 F. 3d 155, 170, 364 U.S. App. D.C. 132, 147 (D.C. Cir. 2004); *Tuck v. Pan American Health Organization*, 215 U.S. App. D.C. 201, 668 F. 2d 547, 549 (D.C. Cir. 1981).  As the Supreme Court has noted—

> it is appropriate to restate certain basic principles that limit the power of every federal court. Federal courts are not courts of general jurisdiction; they have only the power that is authorized by Article III of the Constitution and the statutes enacted by Congress pursuant thereto.

*Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 541, 106 S. Ct. 1326, 89 L. Ed. 2d 501 (1986).

Article III of the United States Constitution currently provides for seven prongs of judicial power, namely—

> [1] to all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States, and Treaties made, or which shall be made, under their Authority; [2] to all Cases affecting Ambassadors, other public Ministers and Consuls; [3] to all Cases of admiralty and maritime Jurisdiction; [4] to Controversies to which the United States shall be a Party; [5] to Controversies between two or more States; [ . . . ] [6] between Citizens of different States; [and] [7] between Citizens of the same State claiming Lands under Grants of different States[.]

U.S. Const., art. III, § 2, cl. 1 (*c.f.* amend. XI ("The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another States, or by Citizens or Subjects of any Foreign States.").

Jurisdiction before the Federal courts must fall within at least one of these seven prongs of cases and controversies enumerated in Article III.

In contrast to the district and bankruptcy courts, the FISC fails to fall under any of the seven types of cases and controversies.  Instead, Congress created the FISC under FISA in 1978, with the FISC judges appointed from the Article III district courts.

While the Constitution authorizes jurisdiction in controversies wherein the United States is a party, *see Postmaster-General v. Early*, 25 U.S. (12 Wheat.) 136, 6 L. Ed. 577 (1827) (Finding that Federal circuit courts have jurisdiction of suits brought in name of postmaster general of the United States on bonds of deputy postmasters), there is no *controversy* that exists before the FISC, as the jurisdiction of the FISC is limited to *ex parte* applications.

As noted previously, *supra* at pp. 16-17, under Titles I and III of FISA, the jurisdiction of the FISC is limited "to hear[ing] applications for and grant[ing] orders" that approve "electronic surveillance anywhere within the United States," 50 U.S.C. § 1801 (a)(1), or for "a physical search in the United States of the premises, property, information, or material of a foreign power or an agent of a foreign power for the purpose of collecting foreign intelligence information," 50 U.S.C. § 1822 (c).  Meanwhile, the only appellate authority under FISA, the FISCR, is limited "to review[ing] the denial of any application made under" the provisions of both Titles I and III of FISA.  50 U.S.C. § 1803 (b).

This creates a significant, unique, untenable, and intractable jurisdictional problem, one that is potentially fatal for the FISC itself.

Fundamentally, a "case" is " a civil or criminal proceeding, action, suit, or controversy at law or in equity <the parties settled the case>," *Black's Law Dictionary* 242 (9th Ed. 2009), or "a suit or action in law or equity," *Merriam Webster's Collegiate Dictionary* 191 (11th Ed. 2012).

Alternatively, a "controversy" is "a disagreement or dispute, esp. in public" or "a justiciable dispute", *Black's Law Dictionary* 379, or "a discussion marked esp. by the expression of opposing views." *Merriam Webster's Collegiate Dictionary* 272. Therefore, "cases" and "controversies" comprise of a dispute between at least two parties, or in anticipation of at least two parties in the case of grand juries and subpeonas.

As opposed to Article III courts, Congress has the authority to create Article I courts to try cases in the District of Columbia and U.S. territories not within a state. *See Palmore v. United States*, 411 U.S. 389, 390-91, 93 S. Ct. 1670, 36 L. Ed. 2d 342 (1973); *American Ins. Co. v. 356 Bales of Cotton*, 26 U.S. (1 Pet.) 511, 546, 7 L. Ed. 242, 1 F. Cas. 658 (1828). Congress may assign certain criminal prosecutions to courts-martial, *see Dynes v. Hoover*, 61 U.S. (20 How.) 65, 79, 15 L. Ed. 838 (1857), and military commissions, *see Ex parte Quirin*, 317 U.S. 1, 46, 63 S. Ct. 2, 87 L. Ed. 3 (1942). Congress may also assign to administrative agencies the adjudication of disputes involving "public rights" stemming from federal regulatory programs. *See Stern*, 131 S. Ct. at 2610; Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 284, 15 L. Ed. 372 (1855).

The FISC is simply not a court that is authorized by Article III of the United States Constitution. Rather, both the FISC and FISCR are merely attempts by Congress to create an Article I court that uses the appointment of Article III judges as a sophisticated "window dressing."

The Fifth Amendment provides that no person shall be "deprived of life, liberty or property, without due process of law." *U.S. Const. amend. V.*

"The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S. Ct. 2963, 41 L. Ed. 2d 935 (1974)

(citing *Dent v. West Virginia*, 129 U.S. 114, 123, 9 S. Ct. 231, 32 L. Ed. 623 (1889)); *see also Scott v. Conley*, 937 F. Supp. 2d 60, 74 (D.C.D.C. 2013). The actions of the Defendants in conducting clandestine surveillance and physical searches involving the Plaintiff clearly fall within the criteria of "arbitrary."

"Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

"The fundamental requirement of due process is the opportunity to be heard at a meaningful time and in a meaningful manner." *Id.*, 424 U.S. at 333 (internal quotation marks omitted). "The due process clause assures a full hearing before the court or other tribunal empowered to perform the judicial function involved." *Baltimore & Ohio Railroad Co. v. United States*, 298 U.S. 349, 369, 56 S. Ct. 797, 803, 80 L. Ed. 1209 (1936). This "includes the right to introduce evidence," and the right to "have judicial findings based upon it." *Id.*

Due to the secret and *ex parte* nature of FISC, the Plaintiff has not had zero "opportunity to be heard," or "in a meaningful manner." *Baltimore & Ohio Railroad Co.*, 298 U.S. at 369. The Plaintiff has been barred from "introducing evidence" or from having any "judicial findings" based on that evidence. *Id.*

The Defendants' actions have injured the Plaintiff's physical and mental state. The Defendants have interfered with her right to free speech and association. The Defendants have also taken her physical property (including both tangible items, and intangible information) by clandestine means. All of this was done by the Defendants without giving the Plaintiff the due process of law afforded to her under the Fifth Amendment.

For the foregoing reasons, the Defendants' clandestine physical searches, seizures, and electronic surveillance involving the Plaintiff violate the guarantee of due process of law grant to her under the Fifth Amendment of the United States Constitution.

### E.   THE DEFENDANTS' ACTIONS DURING THE "FALSE FLAG OPERATION" CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT

The Defendants coordinated to have undercover federal agents conduct a sophisticated "false flag operation" involving the Plaintiff.  *See, e.g. United States v. Hoffman*, 995 F. Supp. 2d 555, 558 (E.D.Va. 2014) ("a false-flag operation is an undercover operation where an intelligence service assumes the identity of a foreign intelligence service" with the goal of determining whether a person is willing to cooperate with foreign intelligence operatives) (appeal at 612 Fed. Appx 162 (4th Cir. 2015)); *also United States v. Squillacote*, 221 F.3d 542, 550.

In this case, the federal agents assumed the identities of a terrorist organization, and staged an elaborate mock attack on the prison in the presence of the Plaintiff.  The agents attempted to create the ideal circumstances for the Plaintiff to attempt to escape.  Instead, the operation traumatized the Plaintiff, causing intense fear, anxiety, and physical illness in an hourslong ordeal all night long.  The Defendants' actions during this operation violated the Plaintiff's right to be free from cruel and unusual punishments under the Eighth Amendment of the United States Constitution.

"To establish an Eighth Amendment violation, [the Plaintiff] must make an objective and a subjective showing."  *Yassin Muhiddin Aref v. Holder*, 774 F. Supp. 2d 147, 167-168 (D.C.D.C. 2011); *see also Farmer v. Brennan*, 511 U.S. 825, 834, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994).

Under the objective standard, the Plaintiff can plainly show that the Defendants' actions

in the high security wing of the USDB were "sufficiently serious." *See Id.* In essence, the Plaintiff was denied the "minimum civilized measures of life's necessities" by the Defendants during the night and early morning of October 10 and 11, 2016. *Wilson v. Seiter*, 501 U.S. 294, 298, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (internal citations omitted); *see also Hudson v. McMillian*, 503 U.S. 1, 8-9, 112 S. Ct. 995, 117 L. Ed. 2d 156 (1992) ("Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, . . . only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation.").

In this instance, the Defendants' actions through the federal agents caused severe physical illness and severe anxiety in the Plaintiff, which are objective injuries.

Under the subjective standard, the Plaintiff can show that the Defendants' actions demonstrate a "deliberate indifference" to both the Plaintiff's health and safety. *See Farmer*, 511 U.S. 825. "[T]he question whether the measure taken inflicted unnecessary and wanton pain and suffering ultimately turns on whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson*, 503 U.S. at 6 (quotation marks omitted)

Such malicious and sadistic indifference to the Plaintiff's health and safety is dependent on the context. "Conduct that shocks in one environment may not be so patently egregious in another, however, and the concern with preserving the constitutional proportions of substantive due process demands an exact analysis of circumstances before any abuse of power is condemned as conscience shocking." *O.K. v. Bush*, 377 F. Supp. 2d 102, 112 (fn. 10) (quotation marks omitted) (quoting *County of Sacramento v. Lewis*, 523 U.S. 833, 846, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)); *see also Hudson*, 503 U.S. at 4 ("What is necessary to establish an

'unnecessary and wanton infliction of pain,' we said, varies according to the nature of the alleged constitutional violation."). For example, the Supreme Court has set a higher bar for excessive force claims arising out of riots or high-speed chases than in other settings. *See Lewis*, 523 U.S. at 848.

In this context the Plaintiff was peaceful, relatively calm (given the high stress situation) and cooperative while locked inside an isolated cell. The immediate and plausible threats of force, to include the use of firearms and explosives, by the Defendants was excessive and unnecessary.

The Defendants knowingly and willingly planned and executed this "false flag operation." The Defendants even used very specialized resources and techniques available at their disposal. For instance, when designing such a "false flag operation," the Federal Bureau of Investigation utilizes their Behavioral Analysis Unit to prepare a report to examine the personality traits of the subject to provide suggestions to the undercover federal agents. *See, e.g Squillacote*, 221 F.3d at 550.

For the foregoing reasons, the Defendants' actions during this "false flag operation" while conducting clandestine physical searches and seizures involving the Plaintiff violated her right to be free from cruel and unusual punishments under the Eighth Amendment of the United States Constitution.

## II.     PLAINTIFF IS LIKELY TO SUFFER FURTHER IRREPARABLE INJURY IF RELIEF IS NOT GRANTED

The Defendants have already executed several actions based on the FISC orders. The Defendants are likely to continue to file applications to the FISC under FISA. "Extensions of an order issued under," Titles I and III of FISA, "may be granted on the same basis as the original order upon an application for an extension and new findings made in the same manner as

required for the original order."  50 U.S.C. §§ 1805 (d)(2), 1824 (d)(2).

The Plaintiff and her associates are unable to defend against or protect themselves against the Defendants' electronic surveillance or physical searches.  The Plaintiff has no other means to express a redress of her grievances available other than in seeking this preliminary injunction. The entire mental state, physical state, and state of the enviornment surrounding the Plaintiff is directly and negatively impacted by the prospect of further physical searches and electronic surveillance.

In the absence of relief, the Plaintiff will continue to have her property rights violated by the Defendants without due process.  The Plaintiff will also continue to parse her speech, both in public and private, and to reduce her association with other people in the absence of such an injuction.

In effect, the Plaintiff and her associates will not be able to return to the life she had prior to the Defendants' actions in this case, and the existence of their activities under FISA unless the court intervenes with the requested preliminary injunction.

## III.   THE BALANCE OF EQUITIES WEIGH IN FAVOR OF THE PLAINTIFF

In assessing the balance of equities, the courts generally consider whether the requested injunctive relief would "substantially injure other interested parties."  *Ark. Dairy Co-op Ass'n, Inc. v. U.S. Dep't of Agric.*, 573 F.3d 815, 821, 387 U.S. App. D.C. 346 (D.C. Cir. 2009).

In this instance, the Defendants' would not suffer any injury with the requested injunction in place.  The requested preliminary injunction is narrow in scope, would substantially protect the Plaintiff from further irreparable injury, and have no substantial effect on the Defendants.

Therefore, the balance of equities weighs in favor of granting a preliminary injunction in this case.

## IV.    A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

Enforcing laws by unconstitutional means and in an unlawful manner is not in the public interest.   The Defendants are engaged in sweeping clandestine surveillance and searches that involve the Plaintiff.   This affects swaths of the public, including virtually any person associated with the Plaintiff, and subsequently an unknown order of people associated with those associates, *ad infinitum.*

The public has been impacted at very large scales by broad and sweeping actions of the Defendants using FISA in recent years.   *See. e.g. ACLU v. Clapper*, 785 F.3d 787 (examining electronic surveillance under FISA).   Even though a preliminary injunction in this case would be narrowly tailored to Plaintiff and her associates, the public at large would benefit from having an order that protected the rights enshrined in the constitution.

Additionally, these violations are clearly shown by the Plaintiff, supra at pp. 8-24, to have a very substantial likelihood of succeeding on the merits in this case.

Therefore, the Court should issue the requested preliminary injunction as it protects the Plaintiff as well as her associates and the public at large from further harm by the Defendants.

<b><u>CONCLUSION</u></b>

For the foregoing reasons, the Court should grant the Plaintiff's motion and enter a preliminary injunction that, during the pendency of this suit, that would bar the Defendants and their agents from --

(i) conducting electronic surveillance under any applications or orders under Title I of FISA that involve the Plaintiff;

(ii) conducting physical searches under any applications or orders under Title I of FISA that involve the Plaintiff; and

(iii) seeking any future orders under Titles I or III of FISA involving the Plaintiff without reasonable and justifiable cause.

Respectfully submitted,

CHELSEA E. MANNING
Plaintiff, *pro se*
1300 North Warehouse Road
Fort Leavenworth, KS 66027-2304

January 3, 2017

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| Chelsea E. MANNING, Plaintiff, | ) ) ) ) | Case No.  1:16-CV-02307-CRC |
| v. | ) ) ) | |
| James R. CLAPPER, *et al.* Defendants. | ) ) ) ) ) | |

## DECLARATION OF CHELSEA E. MANNING
## IN SUPPORT OF PLAINTIFF'S MOTION
## FOR A PRELIMINARY INJUNCTION

1.     I, the undersigned declarant, Chelsea Elizabeth Manning, am the Plaintiff in this

case. I hereby state the following in support of this motion for a preliminary injunction.

### BACKGROUND

2.     On October 3, 2016, dozens of uniformed military police conducted sweeping

searches of the United States Disciplinary Barracks at Fort Leavenworth.  The next day, at

approximately 3:40 P.M. on October 4, 2015, I was in-processed by the Special Housing Unit

("SHU") shift leader at the prison for serving a scheduled period of disciplinary segregation[1]

earlier than expected.  I was assigned to a cell on "Alpha Tier" of SHU East.  Shortly thereafter, I

made a suicide attempt.   While semi-conscious, I was moved to a different cell for

---

[1] Disciplinary segregation ("DS") is a restrictive status placed on inmates who are convicted of administrative institutional offenses while in prison. The USDB uses Army Corrections Command Policy Letter #16 as a guide for which institutional offenses may be charged against an inmate, and how  serious the infractions are, while Army Regulation 190-47 and USDB Regulation 600-1 provide instructions on how disciplinary boards and appeals are conducted.

Mail Room

JAN  '· 2017

. P. Caesar, Clerk of Court
  ·nt  District of Columbia

suicide risk (SR) status.[2] I spent the next sever (7) days concurrently serving my DS while on SR status.

3.      In the two (2) days before Monday, October 10th, 2016, several inmates in "Alpha Tier" were escorted and moved into other sections of the SHU other than "Alpha Tier." No explanation was provided for these sudden inmate moves.

4.      Some time after dinner but before sunset on October 10th, 2016—approximately 6:00 P.M. to 8:00 P.M.—two correctional specialists, namely (SPC) Taylor and SPC Cobble, were involved in an unusual and peculiar discussion. This included discussion of—

(a)      A "cyber attack" on the Eastern seaboard of the U.S., specifically New England and the Mid-Atlantic regions, that killed several dozen people;

(b)      A Twitter account posting a tweet mentioning me specifically being "blown up" and "killed," allegedly made by a correctional specialist assigned to Oscar Housing Unit (OHU) in general population;[3]

(c)      The U.S. Congress entering an emergency session to pass new draconian anti-terrorism legislation directly in response to the "cyber attack" mentioned above;[4]

(d)      A proposed amendment to the U.S. Constitution, specially the "twenty-eighth amendment," that would bar any person convicted of a felony offense from holding political office; and,

(e)      Several emergency executive orders by the "fucking President" directly affecting the operations and control of the USDB.

---

[2] Suicide Risk (SR) is a restrictive status placed on inmates who show signs of suicidal thoughts or actions. The inmate is placed in an empty cell with no personal items, to include clothing, a pillow, or a mattress. The only items assigned to an inmate on SR status are a tear-proof or "suicide proof" smock and blanket. The inmate is placed on "line of sight" observation by a correctional specialist the entire time SR status is imposed on an inmate.

[3] Twitter is an online service for short instant message communications ("tweets") with any number of people ("followers") who subscribe to an account. I regularly dictate tweets over the prison telephone for the Twitter account **@xychelsea**.

[4] U.S. Congress appears to have been in recess during this time period.

## THE ATTACK OR "TAKEOVER" OF THE
## U.S. DISCLIPLINARY BARRACKS

5.      Later, at shift change for "swing shift" and "night shift" correctional specialists—approximately 10:00 P.M. on October 10th 2016, there was a loud commotion throughout SHU East. This commotion consisted of—

(a)      A female voice yelling "Goooo Chelsea!" from outside of "Alpha Tier"

(b)      The sound of a radio chatter and distant yelling by correctional specialists including an interrupted "PALS" alarm which was not authenticated by the Watch Commander or Assistant Watch Commander;[5]

(c)      The sound of the HU East "booth" non-commissioned officers and correctional specialists asking "who are you?" And unidentified and unfamiliar male voice explained "Oh, I am new here.";

(d)      Noise associated with a physical altercation between multiple people, cries of assistance, and the report of a suppressed pistol;[6]

(e)      The female voice motioned above directing two (2) other people to "bind and gag" the bodies of correctional specialists, "behind their backs" and with cord wrapped at least "four times" or "zip tied,"—I visually witnessed the female wearing an Army Combat Uniform (ACUs) binding a correctional specialist also in wearing ACUs; and,

---

[5] A "PALS" alarm system is a panic button alarm system that alerts all active correctional specialists in the USDB of an emergency or their incapacitation.
[6] A sound suppressor or "silencer" is a static device attached to the barrel of a firearm that lowers the decibel level of the supersonic report that occurs when firing rounds through the barrel. The lowering of the sound of suppressed forearms is often exaggerated in films and video games—the gases from the chamber of the firearm still escapes from when the bolt of the firearm moves, causing a loud mechanical "clack" sound. The decibel level of a suppressed firearm and a firearm firing blanks with a "blank fire adapter" attached to the front of the barrel are similar, though the pitch of the report is different.

3

(f)     The sounds of the manual locking and unlocking the showers in "Alpha Tier" and placement of bodies into the shower;

6.     The attackers, apparently consisting of one (1) female leader and at two (2) other male subordinates, assumed the role of the correctional specialists while an unfamiliar voice spoke through the intercom system to the SHU East control booth. Their cadence and tone of their voices, and their mannerisms were atypical of military personnel. This included how they—

(a)     Spoke to one another in hushed tones about "bombs," "TNT," and "C-4";

(b)     Used cliché language usually used in films and video games to execute a plan to place the bombs in SHU East, Oscar Housing Unit (OHU) and November Housing Unit (NHU)—"Oscar and November Pods";

(c)     Incorrectly referred to the OHU as being "alpha one";[7]

(d)     Described a bag containing "identification documents," maps," "passports," "extra ammunition";

(e)     Described escape routes, including paths that avoided areas such as "KCI"[8] and "choke points" such as "bridges";

(f)     Described clothing for "Chelsea" to wear, with "wigs," "sunglasses," "make-up," and other accessories and outfits;

(g)     Mentioned that "Chelsea needed to shave so she could "blend in";[9]

---

[7] This is radio terminology used by the correctional specialists and non-commissioned officers when describing the building housing Kilo House Unit and Lima Housing Units.
[8] Kansas City International Airport
[9] While on SR status, inmates are not allowed to use razors or exit the cell for a barber to cut facial hair. This meant that during these events I had an approximately one-quarter inch (1/4") beard

4

## THE "HOSTAGE" OR "KIDNAPPING" SITUATION
### INVOLVING INMATE MANNING

7.    During this "attack," I became very frighten. I instantly recalled the Orlando mass shooting attacking the Pulse night club in June. I believed that people were being injured or killed around me, and that I was unable to fight them or run away from them. I feared for my own life. I tried my best to pretend that I was sleeping, including trying to hide my panicked breathing by raising an arm to keep the blanket from rising and falling.

8.    Several minutes passed by, while the "attackers" who assumed the rule of the "Alpha Tier" correctional specialists ran around and harassed the correctional specialist "hostages" while there were locked inside the shower. At this time I heard—

(a)    The female laughing and saying "Here, take a shower," and I heard the shower running for a few minutes;

(b)    The two males speaking in broken Arabic[10], discussing a "base" or "the base";

(c)    Cries and groans in pain including "my neck," and "my knee";

(d)    Gurgling and gasping noises, like people dying;

(e)    The continuing of sporadic reports of suppressed pistol fire; and,

(f)    Sounds of attackers mopping either water or blood, at times while whistling;

9.    Eventually, the attackers regrouped and coordinated with at least two (2) other voices to inform the female and apparent leader of the group. They told her that the "bombs" were "in place" and that most of the "guards" were "killed or tied up."

---

[10] Based on modest familiarity with Arabic from working as an Intelligence Analyst, I de3tected what sounded like an Arabian Peninsula inflection and accent in their speech, though they were clearly not native speakers

10.     The female hesitated for a moment, and then ordered the other males to "pull her." At this point, the female knocked on the door of my cell several times. I responded by pretending that I didn't know what was going on. I said "can't you guys just keep it down out there, people are trying to sleep."

11.     After a few minutes she spoke through a crack in my cell door saying "Chelsea," "Chelsea," "We're here to get you out." I did not respond. Eventually she spoke to the others and said "I don't think she's going to cooperate."

12.     After a few hours of panic, fear, terror, and anxiety, I became physically sick. I ran to the toilet and vomited. A male "attacked" posted at my cell door noticed me moving. He signaled to the female.

13.     In panic, I came up with a plan to feign illness, to seem like I was unable to fight them, or that I needed help. I pressed the button at my door of my fell for the intercom to the SHU East booth. An unfamiliar male voice responded.

14.     I asked the person in the booth to "sign me up for sick call," "I'm not feeling well." The booth responded with the microphone on by speaking to someone else, asking "now what do I do?"

15.     Eventually, he came over the intercom and asked me "Okay, do you need CLS?"[11] I responded "No, I think I can wait until the morning."

16.     The female came up to the door a few minutes later and told the male posted at my cell door that "she's faking it," that's "a false cough," and "she's not really vomiting."

---

[11] CLS refers to Combat Lifesaver, Army terminology for someone trained in treating injuries in lieu of a medical specialist

17.     At this point, the reality of the situation sank in. My adrenaline kicked in. I tried to remain calm. I paced around the cell for a few minutes pondering different ways to figure this situation out. I came up with a plan.

18.     I planned on confirming their identity by determining the reaction of the "attackers." If they were real correctional specialists, they would know the standard operating procedures and do as they are trained. While doing this, I also wanted to draw the "attackers" into opening the cell door. Then I would fight my way out of the cell using one or two quick stunning attack moves. My goal was to grab one of their pistols and perhaps gain control of the situation. Otherwise, I figured that I would get injured or killed0—though I rationalized that this would be better than being a hostage.

19.     I walked over to the corner of the cell and leaned my body up against the wall into a position where the "line of sight" between the cell door window and my body was broken.

20.     After a few moments, the male posted at the cell door got concerned. "Hey, where is she?" he said. After a few moments the male called for the female. "Hey, Jessica, I can't see her. I don't know where she is."

21.     The female, "Jessica" came up to the door. She pointed a flashlight into the cell and searched around the cell for a few moments. Then she spoke through the door. "Chelsea, Chelsea." "Hey are you there? Chelsea? Are you okay?" Then she asked the male, "Does she have a weapon?"[12]

22.     After a few more minutes of their puzzling over my disappearance, I jumped out in front of the window startling the female. "Who in the fuck are you people?" I demanded loudly, to no response. "You are not correctional specialists, so who are you?" I demanded again.

---

[12] I did not in fact have a weapon

23.     "Jessica" responded "Of course we're guards." "Yeah, we're prison guards at the USDB."[13] The two males conversed in Arabic in a very low voice for a moment. I was not able to make out what was said.

24.     "Are you guys going to hit your PALS" I loudly demanded. One of the males looked at "Jessica" with a quizzical expression. "Are you going to activate your force cell move team?"[14] "Are you going to get the watch commander?"

25.     The three of them looked at each other with puzzled looks again. They shook their heads from side-to-side. "Jessica" answered "No" to each of my questions, while one of the males struggled to keep himself from giggling.

26.     Now, I was terrified. I figured that I was going to be taken kidnapped, take hostage, tortured, or even killed. I desperately wanted them to open the door for a confrontation so we could get it over with—especially since they appeared to have explosives that could kill hundreds of inmates and military staff. Though, I figured I was more likely to get killed than succeed.

27.     I paced around the cell for a few more minutes. I returned to the window. I asked each of the three "attackers"—"Jessica" and the two males—the question "Who are you?" In response—

        (a)     The male posted at the window of the cell shrugged;

        (b)     "Jessica" said a name that I couldn't quite make out, though it sounded very generic, such as "Smith," "Johnson," or "Jackson";

---

[13] U.S. Army correctional specialist (31 Echo) avoid the usage of the term "guard." Some are even offended by calling them "guards."

[14] Standard operating procedure for correctional specialists in the SHU is during an unusual occurrence or disturbance—such as leaving "line of sight" while on SR status—to hit the PALS panic button and prepare a team of multiple correctional specialists, the Force Cell Move Team (FCMT) to wear heavy armor, shields, and stun weapons to forcibly enter a cell, take control of, and extract an unruly or intractable inmate from the cell. This is normally referred to as a "cell extraction."

(c)   The other male—who was better at speaking in Arabic than the first one who shrugged—leaned on the railing of the stairs to the second tier with one hand in his pocket, a particularly unmilitary and unprofessional manner for a correctional specialist, looked down at the name tape on his uniform and said "Well, my name is Ramsey, of course."

28.   Soon after, "Ramsey" and "Jessica" conversed for a moment at a very low tone. Then in a normal tone "Jessica" said "there isn't anything going on here, is there?" "Ramsey" said "Yeah, everything seems fine to me." Then "Ramsey laughed at "Jessica" and said God-willing in Arabic.[15]

29.   Eventually, I gave up on a reason and yelled my last questions "Okay! So what am I? Am I a hostage? Am I being kidnapped? Which is it, huh? Just fucking tell me!"

30.   Shortly thereafter, I sat down in front of the window. I felt dejected. I started to cry while sitting in the fetal position. A few minutes later the lights came on in the cell. It was 5:00 A.M. on October 11th, 2016. We had stayed up all night long.

## BREAKFAST, SHIFT CHANGE AND CLEANUP

31.   I sighed. I asked for all three of them to come to the window. When they were close to the window, I asked the attackers" to open my feed tray so that I could speak to them more easily. They refused. Then, I asked them for my classes, so that I could "see you guys better." This they also refused.

32.   I was tired. I was infuriated. I had been terrorized all night long. I was trembling. I loudly exclaimed, "I do *not* know who you fucking people are, or what you are doing—but, if you what you're doing isn't *legitimate* or *legal* then I will be the star witness for the U.S. attorney at you federal trial—assuming, of course, you fucks don't kill me first."

---

[15] This is a transliteration of the phrase "Inshallah" (نا شل)

33.     At this, "Jessica" stormed off to the SHU East booth, leaving "Ramsey" and the shrugging male behind. They looked at me with a dejected and un-amused expression. They also seemed to be angry. "Jessica" returned without explanation.

34.     Some time later, a correctional specialist that I recognized walked into "Alpha Tier." When he came close to my door, I called for him. "Hey, uh. I don't think these guys are really Echoes."[16] He paused and gave me a puzzled look before starting to walk out of "Alpha Tier."

35.     "Jessica" sprang up from the table. She had her hands behind her back. She quickly moved, as if trying to sneak up on the correctional specialist. Turning, she appeared to be carrying a pistol or another type of weapon. When they both were out of the sight of my cell window, one of the male attackers said "just shoot him." Then, I heard another report of suppressed pistol fire, apparently executing the actual correctional specialist. I just sat down helplessly watching the two male "attackers" outside my cell.

36.     At approximately 6:00 A.M., breakfast time in the USDB SHU, an unidentified black male "sergeant" appeared with a polystyrene clamshell with my "finger food" breakfast.[17] The shrugging male unlocked and opened the feed tray.

37.     The "sergeant" said "Alright Manning, here is your food." I quickly noticed that he was not wearing a black and white "SHU Shift Leader" patch on his left shoulder. "Where is the SHU Shift Leader?" I asked the "sergeant."[18] The "sergeant" responded in an unconvincing tone, "Oh, he couldn't make it." I knew that this was incorrect protocol for the SHU Staff, and

---

[16] Meaning 31E, see supra at p. 5, footnote 12
[17] All foot items given to SR status are "finger food," or food items that can be eaten without a utensil. This is because utensils such as "sporks" are not provided to SR inmates for safety reasons.
[18] Food is brought to the SHU from the USDB dining facility in two carts. One cart is used for SHU East, and the other is used for SHU West. They each have an electrical cord plug-in for a warmer and cooler for "hot" and "cold" trays, respectively.

that they were not following the SHU standard operating procedures.  In response, I informed the "sergeant" that "I cannot accept this food tray."  "Are you sure?" he asked.  I responded "yes." He finished the conversation saying "Okay, well, I'll go put this back in the warmer then."

38.     A few minutes later, at approximately 6:30 A.M., the people I identified as the "attackers" all left.  They were replaced by the regular assigned correctional specialists from the oncoming shift.  I recognized all of these individuals as those who have worked in the SHU East maximum security housing area several times before.

39.     After the sun came up, everything returned back to normal.  It was a normal Tuesday morning.  The only exception was that several of the correctional specialists began to "deep clean" the entirety of the "Alpha Tier" area using cleaning solutions and solvents with a very strong odor.

40.     I did not recognize, nor have I ever seen "Jessica" before.  I have not seen her since the events of October 10-11, 2016.  Nor did I recognize the "sergeant" before.  I have not seen him either.  I have seen the person with the name and name tape "Ramsey" on the night shift on at least two separate occasions since the events.  I do not recognize, nor have I seen the shrugging male individual.

## THE AFTERMATH

41.     Later that morning, I spoke with the Chief, Mental Health Division, USDB, Dr. Ellen Galloway.  Dr. Galloway is my primary mental health provider.  I described all of the events above in detail.  I described the trauma of the experience.  I told her that the event reminded me of the Orlando mass shooting earlier in June 2016—which deeply affected myself and my close friends throughout the queer and trans community.

42.     Dr. Galloway responded that she would help me with the trauma that I experienced.   She began to provide me with treatment for trauma and anxiety in the weeks following the unusual events of October 10-11, 2016.

43.     Throughout the weeks following the events, I have described the events on that night in detail to several people.   During this time, I have submitted multiple Inspector General action requests to the Office of the Director of National Intelligence, the Department of Defense, the Department of Justice, the Department of Homeland Security, and the Combined Arms Center and Fort Leavenworth.

## THE ELECTRONIC INTRUSION INTO A HANDHELD DEVICE

44.     On the night of November 3, 2016, I made a phone call to a friend.   During the phone call, at approximately 9:45 P.M. to 10:00 P.M., my friend's phone suffered from an electronic intrusion.

45.     During the conversation, I identified certain indicators and characteristics about this particular phone call that.   Based on my knowledge and experience as an intelligence analyst, I identified the symptoms as being related to a penetration of her smart phone using advanced computer network exploitation techniques.

46.     I am unable to describe the specific indicators or other details about this event in any further detail without divulging information that may be properly classified in the interests of the national security of the United States government.

47.     The phone call abruptly terminated at approximately 10:00 P.M.

## VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct, that I am the person making this statement, and that the attached documents as exhibits are authentic.  28 U.S.C. § 1746.

Executed on:  January 3, 2016

_____
CHELSEA E. MANNING
Declarant

Plaintiff, *pro se*
1300 North Warehouse Road
Fort Leavenworth, KS 66027-2304

**Attached Exhibits**

1.  *Military Correctional Complex, Standard Operating Procedure 26, Inmate Property Disposition* (Sep. 21, 2010) **[REDACTED]**

2.  *Military Correctional Complex, Standard Operating Procedure, Search and Inspection Procedures* (Sep. 29, 2014) **[REDACTED]**

# Exhibit 1

**Military Correctional Complex**
**Fort Leavenworth, KS**

**MCC SOP 26**
**2 1 SEP 2010**

### STANDING OPERATING PROCEDURE
### INMATE PERSONAL PROPERTY DISPOSITION

1. PURPOSE. This Standing Operating Procedure (SOP) establishes procedures for control and accountability of inmate personal property within the facilities of the Military Correctional Complex (MCC), including the United States Disciplinary Barracks (USDB) and the Joint Regional Correctional Facility (JRCF).

2. POLICY. This SOP establishes accountability and control procedures for inmate personal property in those cases where an inmate is moved from one cell or housing unit to another cell or housing unit or is temporarily absent from the facility. Inmate personal property is defined as property either issued to the inmate by the facility or personally acquired by the inmate.

3. PROCEDURAL GUIDELINES. This SOP establishes the procedural guidelines to conform to the requirements set forth in Army Regulation (AR) 190-47, The Army Corrections System and The American Correctional Association (ACA) Standards for Adult Correctional Institutions 4th Edition with Supplement.

4. APPLICABILITY. This SOP applies to all assigned, attached and operationally controlled personnel working at the MCC.

5. PROPONENT. The proponent of this SOP is the Resource and Policy Management (RPM) Office, Chief of Staff (CofS) Office, MCC.

6. REFERENCES. See Appendix A.

7. PROCEDURES.



(b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

2 7 SEP 2010

**(b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)**



(1) The personal property of inmates transferred from general population/TU to SQ or PC will be transferred with the inmate except for facility-issued equipment that will be replaced or provided for in the SHU, (e.g. sheets, pillows).

Opened food and drink containers/packages will be transferred with the inmate and not discarded.

(2) Inmates Transfers from General Population to ASPI/ASFD.

**(b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)**

**(b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)**

**(b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)**

# (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

1. (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

The Discipline and Adjustment (D&A) Board appeal process is considered complete when the inmate has failed to file a D&A Board appeal within the time allotted by (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)          or the appeal authority takes action on any appeal.

2. If the inmate is reduced to Maximum Custody or given Disciplinary Segregation as a result of a D&A Board, the inmate must opt to either mail the property at his own expense or authorize the property's destruction/disposal.

3. If the inmate's appeal is approved resulting in release from the SHU, or the inmate is released from the SHU prior to the completion of the appeals process, the

# (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

(3) Inmate Transfers to Maximum Custody due to a URB.

(a) The personal property of inmates transferred from general population/TU to Maximum Custody will be transferred with the inmate except for facility-issued equipment that will be replaced or provided for in the SHU, (e.g. sheets, pillows). (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

(b) For all remaining property, the inmate must opt to either mail the property at his own expense or authorize the property's destruction/disposal.

d. Inmate Transfers from a Cell or Tier in the SHU to Another Cell or Tier in the SHU.

# (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

(2) If certain inmate property may not be retained in the inmate's new tier or custody status, the inmate must opt to either mail the property at his own expense or authorize the property's destruction/disposal. (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

2 1 SEP 2010

(b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

 e. Inmate Transfers from the SHU to General Population.  Inmates transferred from the SHU to general population will not be allowed to pack and hand carry their personal property, regardless of the tier in the SHU from which they are being moved.  (b)(6), (b)(7)(C), (b)(7)(E), (b)(7)(F)

Facility-issued property that is SHU specific or that will otherwise be provided for in general population will not be transferred.  Opened food and drink containers/packages will be discarded and not transferred.

 f.  Contraband Control.  (ACA 4-4192)

  (1) Correctional Staff will:

(b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

  (2) Central Control will:

(b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

 (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

PETER J. GRANDE
Chief of Staff

APPENDIX A

REFERENCES

SECTION 1
PUBLICATIONS

AR 190-47
The Army Corrections System

MCC Regulation 190-8
Control of Prohibited Property

MCC SOP 4
Discipline and Adjustment Board

The American Correctional Association (ACA) Standards for Adult Correctional Institutions 4th
Edition with Supplement

SECTION II
FORMS

DA Form 4137
Evidence/Property Custody Document

MCC Form 7-3
Inventory of Personal Property

# Exhibit 2

**Military Correctional Complex**　　　　　　　　　　　　　**MCC SOP 31**
**Fort Leavenworth, KS**

2 9 SEP 2014

### STANDING OPERATING PROCEDURE
### SEARCH AND INSPECTION PROCEDURES

1. <u>PURPOSE</u>. This Standing Operating Procedure (SOP) establishes procedures for conducting searches and inspections of facilities, staff members, and inmates. These procedures are used to ensure the security and good order and discipline; locate and control prohibited property and provide for its disposition within the Military Correctional Complex (MCC) facilities, including the United States Disciplinary Barracks (USDB), its satellite Trusty Unit (TU) and the Joint Regional Correctional Facility (JRCF). (ACA 4-4192)

2. <u>POLICY</u>. This SOP establishes procedures for conducting searches and inspections of facilities, staff members, and inmates.

3. <u>PROCEDURAL GUIDELINES</u>. This SOP establishes procedural guidelines to conform to the requirements set forth in Army Regulation (AR) 190-47, The Army Corrections System; Army Corrections Command (ACC) Policy Letter #22, Strip Search Policy; 15th Military Police (MP) Brigade (BDE) Regulation 190-3, Rules of Conduct; MCC Regulation 1-2, Prison Rape Elimination Act (PREA); MCC Regulation 190-8, Control of Prohibited Property; MCC Regulation 210-1, Staff Duty/Authentication Officer; USDB/JRCF Regulation 600-1, Manual for the Guidance of Inmates (MGI), STP 19-31E24-SM-TG Soldier's Manual and Trainer's Guide, MOS 31E, Internment/Resettlement Specialist, Skill Levels 2/3/4; MCC Command Policy #16, Reports, Briefings and Reviews; the American Correctional Association (ACA) Standards for Adult Correctional Institutions 4th Edition with 2014 Supplement; and Prison Rape Elimination Act (PREA), Prisons and Jail Standards, 28 Code of Federal Regulation (CFR) Part 115.

4. <u>APPLICABILITY</u>. This SOP applies to all assigned, attached, or operationally controlled personnel working at the MCC. It also applies to all items, places, facilities, and areas under the jurisdiction or operational control of the MCC.

5. <u>PROPONENT</u>. The proponent of this SOP is the Resource and Policy Management (RPM) Office, Chief of Staff (CofS) Office, MCC.

6. <u>REFERENCES</u>. See Appendix A.

7. <u>DEFINITIONS</u>.

　　a. Prohibited Property. Anything not specifically authorized by proper authority to be in an inmate's possession is prohibited. Inmates must obtain and keep written permission from the facility commander, or authorized representative, to possess any item not authorized by facility policy or staff. Any item not specifically authorized and found in an inmate's possession will be

___

This SOP supersedes MCC SOP 31 dated 13 Aug 14.

2 9 SEP 2014

considered prohibited property. Possession of property obtained from trash receptacles, or which was discarded in any other way by other inmates or staff is prohibited. Property that has been altered from its original form without facility authorization will be considered prohibited property.

b. Contraband. Any item, article or substance not authorized to be possessed by personnel or prohibited persons. This includes items or substances to cause physical injury or adversely affect the security, safety and good order of the institution, or the custody and control of inmates.

c. For the purposes of this SOP, the USDB Directorate of Operations (DOPS) and the JRCF DOPS are referred to as the DOPS. Users should contact/notify the appropriate DOPS when coordinating information.

d. For the purposes of this SOP, the USDB Watch Commander and the JRCF Watch Commander are referred to as the Watch Commander. Users should contact/notify the appropriate Watch Commander when coordinating information.

e. For the purposes of this SOP, the USDB Assistant Watch Commander and the JRCF Assistant Watch Commander are referred to as the Assistant Watch Commander. Users should contact/notify the appropriate Assistant Watch Commander when coordinating information.

f. For the purposes of this SOP, USDB Central Control and JRCF Central Control are referred to as Central Control. Users should contact/notify the appropriate Central Control when coordinating information.

g. For the purposes of the SOP, the USDB Military Police Investigations (MPI) and the JRCF MPI are referred to as MPI. Users should contact/notify the appropriate MPI when coordinating information.

h. For the purposes of the SOP, the USDB Special Housing Unit (SHU) and the JRCF SHU are referred to as the SHU. Users should contact/notify the appropriate SHU when coordinating information.

# (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

Military Correctional Complex

Standard Operating Procedure 31

# Pages 3-6 Redacted in Full

2 9 SEP 2014

# (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

c. Frisk searches may be conducted randomly during mass movements (e.g., work call, work recall, meals, recreation call).

d. All inmates will be frisk searched prior to:

(1) Departure from a work site or appointment.

(2) Attending visitation (in the visitation search room out of sight of any visitor).

(3) Exiting the facility.

(4) Entering the SHU.

# (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

# (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

Military Correctional Complex

Standard Operating Procedure 31

# Pages 8-23 Redacted in Full

2 9 SEP 2014

# (b) (6); (b) (7)(C); (b) (7)(E); (b) (7)(F)

PETER J. GRANDE
Chief of Staff

**2 9 SEP 2014**

APPENDIX A
REFERENCES

SECTION I
PUBLICATIONS

AR 190-47
The Army Corrections System
15 Jun 06

ACC Policy Letter #22
Strip Search Policy
31 Mar 10

15th MP BDE Regulation 190-3
Rules of Conduct
6 May 13

MCC Regulation 1-2
Prison Rape Elimination Act (PREA)
28 Sep 14

MCC Regulation 190-8
Control of Prohibited Property
13 Jun 11

MCC Regulation 210-1
Staff Duty/Authentication Officer
24 Jun 14

MCC SOP 51
Planned Use of the Forced Cell Move Team
04 Oct 12

MCC SOP 85
Entry/Exit Control Procedures
10 Feb 12

MCC SOP 500
Inmate Visitation
03 Feb 12

USDB Regulation 600-1
Manual for the Guidance of Inmates (MGI)
14 Nov 13

2 9 SEP 2014

JRCF Regulation 600-1
Manual for the Guidance of Inmates (MGI)
01 Oct 10

USDB SOP 86
West Gate Operations
31 Jan 12

JRCF SOP 86
West Gate Operations
29 Jan 12

MCC Command Policy #16
Reports, Briefings and Reviews
16 Apr 14

STP 19-31E24-SM-TG
Soldier's Manual and Trainer's Guide, MOS 31E, Internment/Resettlement Specialist, Skill
Levels 2/3/4
20 Jul 12

American Correctional Association (ACA)
Standards for Adult Correctional Institutions 4th Edition with 2014 Supplement

Prison Rape Elimination Act (PREA)
Prisons and Jail Standards, 28 CFR Part 115
17 May 12

SECTION II
FORMS

DD FORM 2713
Prisoner Inmate Observation Report (OR)

DD Form 2714
Prisoner Disciplinary Report/Action (DR)

DA Form 4137
Evidence/Property Custody Document

MCC Form 7-2
Domicile Conduct Report (Domicile Entry)

MCC Form 509
Inspection Record of Prisoners in Segregation

2 9 SEP 2014

MCC Form 510
Inmate Request Slip